**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF IOWA**

| | |
|---|---|
| **BRADLEY PRAZNIK, DERRICK CURRY, and JAMES PRATT,**<br><br>**Plaintiff,**<br><br>vs.<br><br>**CONSUMER SAFETY TECHNOLOGY, LLC, D/B/A INTOXALOCK,**<br><br>**Defendant.** | Case No.: 4:26-cv-00130-SMR-HCA<br><br><br>**CONSOLIDATED CLASS ACTION COMPLAINT**<br><br><br><br>**JURY TRIAL DEMANDED** |

Plaintiffs BRADLEY PRAZNIK, DERRICK CURRY, and JAMES PRATT (collectively "Plaintiffs"), on behalf of all others similarly situated, by and through their undersigned counsel, file this Consolidated Class Action Complaint against Consumer Safety Technology, LLC d/b/a Intoxalock ("Intoxalock" or "Defendant"). Plaintiffs' allegations are made based upon personal knowledge, their own acts, and upon information and belief and investigation of counsel, as to all other matters.

## I.    NATURE OF THE ACTION

1. Plaintiffs and the proposed Class members bring this class action lawsuit on behalf of all persons impacted by a cyberattack (the "Incident") on Defendant's ignition interlock devices ("IIDs") and associated software, systems, and network infrastructure (collectively, the "IT Network").

2. Plaintiffs' claims arise from Defendant's failure to properly secure its IT Network and failure to implement reasonable cybersecurity and system safeguards—such as encryption, multi-factor authentication, timely software patches, and adequate monitoring—which allowed unauthorized third parties to access Defendant's systems and cause widespread service disruptions

affecting Plaintiffs and Class members.

3.      Defendant is a provider of IIDs, helping individuals with DUI/OWI convictions to resume driving safely.[1]

4.      An IID is a small handheld unit that connects to a vehicle's ignition system that a driver blows into before starting the car. If the driver's breath alcohol concentration (BrAC) is above the state's limit, the vehicle will not start.[2]

5.      Defendant represents that its IIDs meet state requirements in 46 states with over 100,000 users.[3]

6.      On March 14, 2026, Defendant experienced the Incident.[4] As a result of the Incident, installations, calibrations, account access, and other court-ordered services of Defendant were disrupted.[5] This prevented many customers, including Plaintiffs and Class members, from being able to use the device to provide a negative alcohol breath sample in order start their vehicles.[6]

7.      The Incident was caused by Defendant's failure to design, implement, and maintain

---

[1] Intoxalock, About Intoxalock, https://www.intoxalock.com/about#:~:text=About%20Intoxalock,used%20in%20all%2050%20states (last visited Apr. 29, 2026).

[2] Intoxalock, Ignition Interlock Cameras: Why They Are Required and How Privacy Is Protected, https://www.intoxalock.com/knowledge-center/camera-required-ignition-interlock-iid (last visited Apr. 29, 2026).

[3] Intoxalock, About Intoxalock, https://www.intoxalock.com/about#:~:text=About%20Intoxalock,used%20in%20all%2050%20states (last visited Apr. 29, 2026).

[4] TechCrunch, *Cyberattack on vehicle breathalyzer company leaves drivers stranded across the US* (Mar. 20, 2026), *available at* https://techcrunch.com/2026/03/20/cyberattack-on-vehicle-breathalyzer-company-leaves-drivers-stranded-across-the-us/.

[5] Cybernews, *Intoxalock restores service after hack left drivers unable to start cars across 46 states* (Mar. 24, 2026), *available at* https://cybernews.com/news/intoxalock-hack-breathalyzer-devices-cars-wont-start-us/.

[6] *Id.*

reasonable and appropriate cybersecurity and system safeguards to protect its IT Network from foreseeable unauthorized access, intrusion, and disruption, including the failure to employ basic industry-standard protections such as adequate encryption, multi-factor authentication, timely security patching, system monitoring, and operational redundancies necessary to ensure the continuous and reliable functioning of Defendant's IIDs.

8.    Defendant owed Plaintiffs and Class members contractual and legal obligations to provide functioning, reliable, and properly secured IIDs, including a functioning, reliable, and properly secured IT Network necessary for the IID's continued operation.

9.    Defendant solicited, entered into agreements with, and received payment from Plaintiffs and Class members for these services, while retaining exclusive control over the design, maintenance, and security of the IIDs and related IT Network.

10.    Defendant breached those obligations by failing to implement and maintain reasonable and industry-standard cybersecurity and operational safeguards necessary to ensure the IID's continuous functionality and reliable performance, including adequate protections against foreseeable unauthorized access and system disruption.

11.    As a result of Defendant's inadequate digital security procedures, Plaintiffs and Class members have suffered and will continue to suffer injuries including: (a) loss of use of their vehicles; (b) lost wages and income; (c) fees paid for services that were unavailable or nonfunctional; (d) out-of-pocket costs incurred to mitigate the disruption; (e) loss of time; and (f) other consequential economic damages.

12.    Plaintiffs bring this action on behalf of all persons impacted by Defendant's wrongful conduct, including its failure to: (i) adequately design, implement, and maintain reasonable cybersecurity measures to protect its IT Network from unauthorized access and

disruption; (ii) ensure the continuous, reliable operation of its ignition interlock device systems and related services; (iii) disclose material deficiencies in its network security, system architecture, and operational reliability; and (iv) timely detect, respond to, and notify Plaintiffs and Class members of the Incident.

13. Defendant's acts and omissions constitute, *inter alia*, negligence, breaches of contract and implied warranties, unjust enrichment, and violations of applicable federal and state consumer protection statutes.

## II.  PARTIES

### Plaintiffs

14. Plaintiff Bradley Praznik, at all relevant times, is a citizen and resident of Burnsville, Minnesota and a customer of Defendant.

15. Plaintiff Derrick Curry, at all relevant times, is a citizen and resident of Worth, Illinois and a customer of Defendant.

16. Plaintiff James Pratt, at all relevant times, is a citizen and resident of Mount Olive, Illinois and a customer of Defendant.

### Defendant

17. Defendant is a limited liability company maintaining its principal place of business at 11035 Aurora Ave, Urbandale, Iowa, 50322. Defendant's registered agent is Corporation Service Company located at 505 5th Ave, Suite 729, Des Moines, Iowa, 50309.

## III.  JURISDICTION AND VENUE

18. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class,

and at least one member of the class is a citizen of a state different from Defendant, namely Plaintiff.

19.    This Court has personal jurisdiction over Defendant because its principal place of business is in this District, it regularly conducts business in this District, and the acts and omissions giving rise to Plaintiff's claims occurred in and emanated from this District.

20.    Venue is proper under 28 U.S.C § 1391(b)(1) because Defendant's principal place of business is in this District.

## IV.    FACTUAL ALLEGATIONS

### A. Background

21.    Defendant is a provider of IIDs and the associated software, systems, and network infrastructure upon which their functionality depends (collectively, the "IT Network").[7] The IT Network is a necessary component of the IID as it allows the device to interface with the broader Intoxalock network to ensure that devices are calibrated correctly. If the device needs calibration and cannot connect to the network, the device will not function and customers cannot start their vehicles.

22.    Plaintiffs and Class members are customers of Defendant who have installed the IIDs in their vehicles and rely on the IT Network for device functionality and to be able to operate their motor vehicles.

23.    Among other expenses associated with the use of Defendant's IIDs, customers pay Defendant lease charges, device protection fees, data processing fees, and lockout charges (when the device prevents the vehicle due to a failed breath test, repeated tests within a short period, or a

---

[7] Intoxalock, About Intoxalock, https://www.intoxalock.com/about#:~:text=About%20Intoxalock,used%20in%20all%2050%20states

missed service appointment). "IIDs are leased, not bought, and typically cost between $70 and $120 per month."[8]

24.     Upon information and belief, Defendant represented and led customers, including Plaintiffs and Class members, to reasonably believe that its IIDs and IT Network were designed, maintained, and secured with reasonable and industry-standard safeguards sufficient to ensure reliable, continuous, and uninterrupted operation of the IID, including protections against foreseeable system disruptions and unauthorized access.

25.     On its public facing website, Intoxalock promotes its "reliable technology" and advertises that it is "recognized as the best interlock device for its ease of use, accuracy, and excellent customer support."[9]

26.     Based on Defendant's representations, the nature of the services provided, and the essential function of the IID for lawful vehicle operation, Plaintiffs and Class members selected and utilized Defendant's IIDs with the reasonable expectation and understanding that Defendant would design, maintain, and secure its system using reasonable and industry-standard safeguards sufficient to ensure reliable and continuous functionality, including protection against foreseeable unauthorized access and service disruptions, including those resulting from cyber threats.

**B.  The Incident**

27.     On March 14, 2026, Defendant experienced a cyber security attack on its IT Network, resulting in a complete shutdown of its IT Network nationwide (the "Incident").[10]

---

[8] Intoxalock, *What Is an Ignition Interlock Device?*, https://www.intoxalock.com/ignition-interlock-devices/what-is-an-ignition-interlock-device

[9] Intoxalock, Why Choose Intoxalock, https://www.intoxalock.com/ignition-interlock-devices/why-choose-intoxalock

[10] TechCrunch, *Cyberattack on vehicle breathalyzer company leaves drivers stranded across the US* (Mar. 20, 2026), *available at* https://techcrunch.com/2026/03/20/cyberattack-on-vehicle-breathalyzer-company-leaves-drivers-stranded-across-the-us/; UpGuard, *Intoxalock Investigating*

28.     The Incident caused widespread disruption across the United States to installations, calibrations, account access, and other court-ordered services related to Defendant's ignition interlock devices.[11]

29.     Customers—including Plaintiffs and Class members—were thereby unable to provide a compliant breath sample and start their vehicles if the device required calibration during that time.[12]

30.     Defendant admits that an unauthorized third party accessed its IT Network and caused a disruption in its services. This disruption was a result of Defendant's failure to implement and maintain reasonable and industry-standard safeguards to protect its IT Network from foreseeable unauthorized access and disruption, resulting in the loss of functionality of its IIDs.

31.     While Defendant sought to minimize the damage caused by the Incident, it cannot and has not denied that there was unauthorized access to its IT Network that resulted in Plaintiffs and Class members inability to start their vehicles.

32.     Despite Defendant's knowledge of the foreseeable risk of cyberattacks and resulting service disruptions, Defendant failed to disclose that its IT Network and cybersecurity practices were inadequate to ensure the reliable, continuous operation of its IIDs, including the risk that such deficiencies could render the IIDs inoperable and prevent lawful vehicle use.

33.     Had Defendant disclosed its substandard data security practices, Plaintiffs and Class members would not have leased the IIDs or would have paid a lesser price for them.

---

*Cyberattack* (Mar. 20, 2026), *available at* https://www.upguard.com/news/intoxalock-data-breach-2026-03-20 .

[11] Cybernews, *Intoxalock restores service after hack left drivers unable to start cars across 46 states* (Mar. 24, 2026), *available at* https://cybernews.com/news/intoxalock-hack-breathalyzer-devices-cars-wont-start-us/.

[12] *Id.*

### C. The Harm Caused by the Incident

34.    When a vehicle becomes inoperable due to a failure in the IT Network, drivers are stranded without warning, sometimes in hazardous conditions such as active roadways, extreme weather, or unsafe neighborhoods. This sudden loss of vehicle operability compromises the safety of drivers and passengers, increases the risk of accidents or injuries, and necessitates emergency measures such as towing or roadside assistance.

35.    In addition, for Plaintiffs and Class members subject to court orders or statutory requirements mandating the use of ignition interlock devices, the inability to provide a breath sample or access a functioning system may also result in legal consequences, including alleged violations of probation or other driving restrictions.

36.    Such inoperability is not a minor inconvenience, but a critical failure that renders the vehicle unusable for its intended purpose and exposes users to both safety risks and potential legal repercussions.

37.    Beyond these foreseeable safety risks and potential legal consequences, vehicle inoperability poses significant financial burdens on affected consumers. Plaintiffs and Class members may have continued to make loan or lease payments, insurance payments, and registration fees on vehicles that could not be driven, and may have incurred out-of-pocket costs for towing, diagnostics, repairs, rental vehicles, and alternative transportation. These expenses were not foreseeable or bargained for at the time Plaintiffs and Class members obtained Defendant's IID.

38.    The Incident also resulted in lost wages or employment consequences for Plaintiffs and Class members who rely on their vehicles as a mode of transportation to and from work or are required to take unpaid leave or exhaust limited paid time off, further diminishing their overall

compensation and financial security.

39.     Accordingly, Plaintiffs and Class members have suffered and will continue to suffer ascertainable economic damages in the form of loss of use of their vehicles, lost wages, lost earning capacity, and related employment benefits. These damages are directly attributable to the Incident and were reasonably foreseeable given the essential role that a functioning vehicle plays in maintaining employment.

**D.  Plaintiffs' Experiences**

**a.  Plaintiff Bradley Praznik's Experience**

40.     Plaintiff Praznik is a resident of Minnesota and, at all relevant times, was a customer of Defendant.

41.     Plaintiff operates a self-employed window and door business and relies on his vehicle for work-related transportation, including travel to customer appointments and job sites.

42.     After an alcohol-related driving incident, Plaintiff Praznik was required to install and maintain an IID in order to lawfully operate his motor vehicle.

43.     Plaintiff Praznik has been a customer of Defendant and its IID services for approximately twelve years and has paid recurring fees in connection with Defendant's services, including but not limited to lease charges, device protection fees, data processing fees, service fees, and other costs associated with the installation, maintenance, and operation of the Defendant's IID. Plaintiff uses Defendant's IID through its mobile application.

44.     Plaintiff Praznik reasonably understood that a portion of the funds paid to Defendant would be used to pay for adequate cybersecurity and protection and that Defendant had promised, either expressly or impliedly, to do so and to provide an operational product.

45.     Plaintiff Praznik reasonably expected that Defendant would exercise reasonable

care in designing, maintaining, monitoring, and securing its IIDs and supporting IT Network so that the device would function reliably and continuously for its intended purpose of enabling lawful vehicle operation.

46. On or about March 16, 2026, Plaintiff Praznik learned that his vehicle had become inoperable when he attempted to travel to work and the IID would not allow the vehicle to start.

47. Plaintiff Praznik attempted to contact Defendant, explaining the urgency of his situation, including that he required his vehicle for work and that both he and his wife had scheduled medical appointments, but received only an automated response from Defendant indicating that Defendant was investigating a "cybersecurity incident."

48. Over the following several days, despite Plaintiff Praznik's repeated attempts to contact Defendant via text message to obtain information regarding the incident, inquire as to when service would be restored, or seek instructions regarding the calibration and operation of the device, Plaintiff continued to receive only automated responses stating that Defendant was "currently experiencing very high message volume and are assisting other customers."

49. Three days after the incident, on or about March 18, 2026, Defendant finally contacted Plaintiff Praznik via text message and instructed him to bring his vehicle to a local service center.

50. As a result of the Incident and Defendant's failed response, Plaintiff Praznik lost the use of his vehicle for several days.

51. During this time, Plaintiff Praznik incurred costs for alternative transportation and experienced missed work opportunities and lost business income due to his inability to travel to scheduled appointments and job sites.

52. Plaintiff Praznik also spent substantial time attempting to communicate with

Defendant and obtain assistance, including extended text message exchanges that were repeatedly met with automated responses and no meaningful resolution.

53.    As a direct and proximate result of the Incident and Defendant's acts and omissions, Plaintiff Praznik suffered damages, including but not limited to loss of vehicle use, out-of-pocket transportation expenses, lost business income, lost time, and other economic and consequential damages.

### b. Plaintiff Derrick Curry's Experience

54.    Plaintiff Curry is a resident of Illinois and, at all relevant times, was a customer of Defendant.

55.    Plaintiff Curry was required to install and maintain an IID in order to lawfully operate his motor vehicle.

56.    On January 26, 2026, Plaintiff Curry had Defendant's IID installed in his vehicle and utilized the device in accordance with Defendant's instructions and applicable legal requirements. Plaintiff uses Defendant's IID through its mobile application.

57.    In connection with Defendant's services, Plaintiff Curry paid fees and charges to Defendant, including but not limited to lease charges, device protection fees, data processing fees, service fees, and other costs associated with the installation, maintenance, and operation of the Defendant's IID.

58.    Plaintiff Curry reasonably understood that a portion of the funds paid to Defendant would be used to pay for adequate cybersecurity and protection and that Defendant had promised, either expressly or impliedly, to do so and to provide an operational product.

59.    Like other customers of Defendant, Plaintiff Curry reasonably relied upon Defendant's representations and omissions concerning the reliability, functionality, maintenance,

and security of its IID and supporting systems.

60.    Plaintiff Curry reasonably expected that Defendant would exercise reasonable care in designing, maintaining, monitoring, and securing its IIDs and supporting IT Network so that the device would function reliably and continuously for its intended purpose of enabling lawful vehicle operation.

61.    On or about March 16, 2026, while chaperoning a school for his daughter, Plaintiff Curry received a notification through Defendant's mobile application indicating that the IID installed in his vehicle was at risk of becoming disabled. Concerned that his vehicle would become inoperable, Plaintiff Curry attempted to return home.

62.    Although Defendant's application indicated that Plaintiff Curry had additional time before the device would become disabled, the IID ceased functioning abruptly while Plaintiff was operating his vehicle, causing his vehicle to unexpectedly become inoperable and creating a dangerous situation that required him to pull over.

63.    After safely stopping the vehicle, Plaintiff Curry was unable to restart it because the IID would no longer permit operation of the vehicle.

64.    Plaintiff Curry contacted Defendant's customer service department and was informed that Defendant was experiencing technical difficulties affecting its systems but were unable to provide any solution that would restore operation of his vehicle.

65.    As a result, Plaintiff Curry was required to arrange and pay for towing services and spent substantial time attempting to address the situation, including communicating with Defendant and coordinating transportation for his disabled vehicle.

66.    On March 17, 2026, Plaintiff Curry attempted to use his vehicle to travel to work, but the IID remained disabled and prevented the vehicle from starting. Because Plaintiff Curry

could not operate his vehicle and lacked reasonable alternative transportation, he was forced to miss work and suffered lost wages and related economic damages.

67.     On March 18, 2026, Plaintiff Curry again attempted to start his vehicle but was unable to do so because the IID remained inoperable.

68.     As a direct result of his continued inability to report to work, Plaintiff Curry lost his employment and suffered additional economic damages, including lost income and lost earning capacity.

69.     Plaintiff Curry also became concerned that the disabled IID could affect his compliance with legal requirements governing operation of his vehicle. Plaintiff Curry therefore contacted the Illinois Secretary of State seeking guidance regarding the inoperable device and was advised that the IID would need to be removed and replaced.

70.     Plaintiff Curry incurred additional expense and effort attempting to secure removal and replacement of the device, however, those efforts proved unsuccessful and resulted in additional delay, inconvenience, and expense, including locating a service provider capable of performing the work and additional towing expenses.

71.     Ultimately, Defendant's IID remained inoperable for approximately one week, during which Plaintiff Curry was deprived of the use of his vehicle.

72.     As a direct and proximate result of the Incident and Defendant's acts and omissions, Plaintiff Curry suffered damages, including but not limited to loss of vehicle use, out-of-pocket expenses, lost time, lost wages, and other economic and consequential damages.

**c.  Plaintiff James Pratt's Experience**

73.     Plaintiff Pratt is a resident of Illinois and, at all relevant times, was a customer of Defendant.

74. After an alcohol-related driving incident, Plaintiff Pratt was required to install and maintain an IID in order to lawfully operate his motor vehicle.

75. Plaintiff Pratt has been a customer of Defendant and its IID services for approximately three years and has paid recurring fees in connection with Defendant's services, including but not limited to lease charges, device protection fees, data processing fees, service fees, and other costs associated with the installation, maintenance, and operation of the Defendant's IID. Plaintiff uses Defendant's IID through its mobile application.

76. Plaintiff Pratt reasonably understood that a portion of the funds paid to Defendant would be used to pay for adequate cybersecurity and protection and that Defendant had promised, either expressly or impliedly, to do so and to provide an operational product.

77. On or about March 16, 2026, Plaintiff Pratt first learned of the Security Incident through an email notification from Defendant.

78. Following the Incident, Plaintiff Pratt was unable to access Defendant's mobile application for several days and experienced difficulty obtaining information regarding the status of Defendant's systems and services. Despite Defendant's representations that customers would not be charged service fees during the outage, Plaintiff Pratt was charged the full service fee for the period in which Defendant's systems were unavailable. Plaintiff Pratt also spent time monitoring his account and attempting to address the disruption in services..

79. As a direct and proximate result of the Incident and Defendant's acts and omissions, Plaintiff Pratt suffered damages, including fees paid for disrupted services, loss of time, and other economic and consequential damages. .

.

## V.   CLASS ALLEGATIONS

80.    Plaintiffs bring this class action, individually and on behalf of the following Nationwide Class:

All persons in the United States whose ignition interlock device was impacted by Defendant's Incident (the "Class").

81.    Specifically excluded from the Class are Defendant, its officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, principals, servants, partners, joint venturers, or entities controlled by Defendant, and its heirs, successors, assigns, or other persons or entities related to or affiliated with Defendant and/or its officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

82.    Plaintiffs reserve the right to amend the Class definition above if further investigation and/or discovery reveals that the Class should be expanded, narrowed, divided into subclasses, or otherwise modified in any way.

83.    This action may be certified as a class action because it satisfies the numerosity, commonality, typicality, adequacy, and superiority requirements therein.

84.    **Numerosity**: The Class is so numerous that joinder of all Class members is impracticable. Although the precise number of such persons is unknown, and the facts are presently within the sole knowledge of Defendant, upon information and belief, Plaintiff estimates that the Class is comprised of thousands of Class members, if not more. The Class is sufficiently numerous to warrant certification.

85.    **Typicality of Claims**: Plaintiffs' claims are typical of those of other Class members because Plaintiffs, like the unnamed Class, could not properly use Defendant's product as a result of the Incident. Plaintiffs are members of the Class, and their claims are typical of the claims of the members of the Class. The harm suffered by Plaintiffs is similar to those suffered by all other Class members which was caused by the same misconduct by Defendant.

86.    **Adequacy of Representation**: Plaintiffs will fairly and adequately represent and protect the interests of the Class. Plaintiffs have no interests antagonistic to, nor in conflict with, the Class. Plaintiffs have retained competent counsel who are experienced in consumer and commercial class action litigation and who will prosecute this action vigorously.

87.    **Superiority**: A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Because the monetary damages suffered by individual Class members are relatively small, the expense and burden of individual litigation make it impossible for individual Class members to seek redress for the wrongful conduct asserted herein. If Class treatment of these claims is not available, Defendant will likely continue its wrongful conduct, will unjustly retain improperly obtained revenues, or will otherwise escape liability for its wrongdoing as asserted herein.

88.    **Predominant Common Questions**: The claims of all Class members present common questions of law or fact, which predominate over any questions affecting only individual Class members, including:

   a. Whether Defendant designed, maintained, and operated its ignition interlock device system and IT Network in a reasonably safe, reliable, and secure manner consistent with applicable standards and foreseeable risks;

   b. Whether Defendant failed to implement and maintain reasonable cybersecurity, operational safeguards, and system redundancies sufficient to ensure the continuous and reliable functioning of its IIDs;

   c. Whether Defendant failed to provide services that were fit for their ordinary and intended purposes, including enabling lawful vehicle operation and compliance with court-ordered or statutory requirements;

d.  Whether Defendant breached express or implied contractual obligations to Plaintiffs and Class members, including obligations to provide functional, continuous, and reliable IID services;

e.  Whether Defendant breached implied warranties of merchantability and fitness for a particular purpose;

f.  Whether Defendant engaged in unfair or deceptive acts or practices by misrepresenting or omitting material facts regarding the reliability, security, and functionality of its IT Network and IIDs;

g.  Whether Defendant was negligent in the design, maintenance, security, and operation of its IT Network and IIDs;

h.  Whether Defendant was unjustly enriched by retaining payments for services that were materially disrupted or nonfunctional; and

i.  The nature and extent of relief, including compensatory damages, restitution, disgorgement, injunctive relief, and other equitable remedies to which Plaintiffs and Class members are entitled..

89.    Plaintiffs know of no difficulty which will be encountered in the management of this litigation which would preclude its maintenance as a class action.

90.    The prosecution of separate actions by individual members of the Class would run the risk of inconsistent or varying adjudications and establish incompatible standards of conduct for Defendant. Prosecution as a class action will eliminate the possibility of repetitious and inefficient litigation.

91.    Given that Defendant has not indicated any changes to its conduct or security measures, monetary damages are insufficient and there is no complete and adequate remedy at

law.

## VI.    CAUSES OF ACTION

### COUNT I

### NEGLIGENCE
### (On Behalf of Plaintiffs and the Class)

92.    Plaintiffs restate and reallege all preceding factual allegations above as if fully set forth herein.

93.    Defendant owed Plaintiffs and Class members a duty to exercise reasonable care in designing, developing, maintaining, and securing its ignition interlock devices ("IIDs") and the associated software, systems, and network infrastructure (collectively, the "IT Network").

94.    This duty arose from, inter alia, Defendant's role as a provider of court-mandated devices essential for lawful vehicle operation, its exclusive control over the IT Network necessary for the IID's functionality, and its collection and use of customer information and system access.

95.    Defendant knew or should have known that failure to maintain adequate cybersecurity and system reliability would foreseeably result in harm to Plaintiffs and Class members, including the inability to operate their vehicles and resulting economic losses.

96.    Defendant was in an exclusive position to prevent the foreseeable harm that would result from the disruption of its IT Network and Plaintiffs and Class members had no ability to audit or verify the integrity of Defendant's data security practices.

97.    Defendant breached its duties by failing to employ industry-standard cybersecurity measures, including but not limited to proper segregation, access controls, password protection, encryption, intrusion detection, secure destruction of unnecessary data, and penetration testing.

98.    Defendant breached its duty of care by failing to implement and maintain reasonable and appropriate security measures to protect its IT Network from unauthorized access

and disruption.

99.    Such failures include, but are not limited to, Defendant's failure to:

    a.    implement adequate encryption protocols;

    b.    require or enforce multi-factor authentication;

    c.    timely patch and update software and systems;

    d.    maintain appropriate system monitoring and intrusion detection;

    e.    employ adequate system redundancy or fail-safe mechanisms to ensure continued operation; and

    f.    adopt industry-standard cybersecurity practices.

100.    Defendant further breached its duty by failing to timely detect, respond to, and mitigate the effects of the Incident, and by failing to provide prompt and adequate notice to Plaintiffs and Class members.

101.    It was reasonably foreseeable, particularly given the growing number of data breaches, that the failure to reasonably protect and secure the IT Network in compliance with applicable laws would result in an unauthorized third-party gaining access to Defendant's networks, databases, and computers and the resulting disruption to Defendant's services.

102.    Plaintiffs and Class members were foreseeable victims of any inadequate security practices on the part of Defendant, and Defendant owed them a duty of care to not subject them to an unreasonable risk of harm

103.    As a direct and proximate result of Defendant's negligence, unauthorized third parties accessed Defendant's IT Network and caused a widespread service disruption to Defendant's IIDs.

104.    This disruption rendered the IIDs inoperable or unreliable, preventing Plaintiffs and

19

Class members from starting and operating their vehicles despite providing compliant breath samples.

105. The injuries suffered by Plaintiffs and Class members were the foreseeable and natural consequence of Defendant's failure to exercise reasonable care in securing and maintaining its IT Network.

106. As a direct and proximate result of Defendant's negligence, Plaintiffs and Class members suffered damages, including but not limited to loss of use of their vehicles, lost wages, out-of-pocket expenses, and other economic and non-economic harms.

## COUNT II

### BREACH OF CONTRACT
**(On Behalf of Plaintiffs and the Class)**

107. Plaintiffs restate and reallege all preceding factual allegations above as if fully set forth herein.

108. Plaintiffs and Class members entered into valid and enforceable contracts with Defendant for the provision of IIDs and related services (the "Contracts").

109. The Contracts required Defendant, inter alia, to provide functioning, reliable, and accessible IID devices and supporting services necessary for Plaintiffs and Class members to lawfully operate their vehicles, including installation, calibration, monitoring, and account access.

110. The Contracts further required Defendant to maintain systems sufficient to ensure the continued operation and availability of the IID services, as well as to exercise reasonable care in safeguarding those systems from disruption.

111. Plaintiffs and Class members performed their obligations under the Contracts or were otherwise excused from performance, including by paying required fees and complying with all applicable usage requirements.

112.    Defendant breached the Contracts by failing to provide the agreed-upon services in a reliable and functional manner.

113.    Specifically, Defendant failed to:

   a.   maintain operational IID services necessary for vehicle ignition;

   b.   ensure access to required services, including installations, calibrations, and account management;

   c.   implement and maintain adequate cybersecurity measures to prevent foreseeable service disruptions; and

   d.   timely restore services following the Incident.

114.    As a direct result of Defendant's breaches, Plaintiffs and Class members were unable to use Defendant's IIDs for their intended purpose, including being unable to start and operate their vehicles despite providing compliant breath samples.

115.    Defendant's breaches deprived Plaintiffs and Class members of the benefit of their bargain under the Contracts.

116.    As a direct and proximate result of Defendant's breaches, Plaintiffs and Class members suffered damages, including but not limited to loss of use of their vehicles, lost wages, out-of-pocket expenses, and other economic and non-economic harms.

117.    Defendant had notice of its breaches, including through system failures, customer complaints, and the Incident, yet failed to cure such breaches.

**COUNT III**

**UNJUST ENRICHMENT**
**(On Behalf of Plaintiffs and the Class)**

118.    Plaintiffs restate and reallege all preceding factual allegations above as if fully set forth herein.

21

119.    Plaintiffs and Class members conferred a direct and substantial benefit upon Defendant by paying fees for IIDs and related services, including installation, monitoring, maintenance, and account access. In making those payments, Plaintiffs and Class members reasonably believed that part of the money that they paid for Defendant would be devoted to paying for data security services necessary to prevent disruptions to the IT Network.

120.    As such, a portion of the payments made by Plaintiffs and Class members is to be used to provide a reasonable and adequate level of data security that is in compliance with applicable state and federal regulations and industry standards, and the amount of the portion of each payment made that is allocated to data security is known to Defendant.

121.    Defendant knowingly accepted and retained these benefits under circumstances in which it would be inequitable and unjust for Defendant to retain such benefits without payment of restitution.

122.    Defendant derived revenue and other financial benefits from Plaintiffs and Class members while failing to provide reliable, functional, and continuous IID services.

123.    Defendant enriched itself by saving the costs it reasonably should have expended on data security measures. Instead of providing a reasonable level of security that would have prevented the disruption of services, Defendant instead calculated to increase its own profit at the expense of Plaintiffs and Class members by utilizing cheaper, ineffective security measures and diverting those funds to its own profit. Plaintiffs and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize their own profits over the requisite security and the safety of the IT Network.

124.    As a result of the Incident and Defendant's inadequate cybersecurity and system maintenance, the IIDs were rendered inoperable or unreliable, depriving Plaintiffs and Class

members of the fundamental benefits for which they paid.

125. Despite these failures, Defendant retained the fees and payments made by Plaintiffs and Class members, without providing adequate or commensurate value in return.

126. Defendant's retention of these benefits violates principles of equity and good conscience.

127. Plaintiffs and Class members lack an adequate remedy at law to the extent Defendant disputes the existence, enforceability, or scope of any governing contracts, or to the extent such contracts do not fully compensate Plaintiffs and Class members for Defendant's conduct.

128. As a direct and proximate result of Defendant's unjust enrichment, Plaintiffs and Class members are entitled to restitution, disgorgement, and/or the imposition of a constructive trust upon all profits, benefits, and other compensation obtained by Defendant.

## COUNT IV

### BREACH OF IMPLIED WARRANTIES
**(On behalf of Plaintiffs and the Class)**

129. Plaintiffs restate and reallege all preceding factual allegations above as if fully set forth herein.

130. Defendant is, and at all relevant times was, a merchant engaged in the business of designing, manufacturing, marketing, distribution, and selling IIDs and maintaining the IT Network necessary for the IID to function as intended.

131. Plaintiffs and Class members leased or otherwise obtained the IIDs from Defendant or its authorized agents.

132. At all relevant times, Defendant knew or had reason to know of the particular purposes for which the IID was required, including that Plaintiffs and Class members would rely

23

on the Defendant's IIDs to lawfully operate their vehicles in compliance with court-ordered requirements.

133. Defendant also knew that Plaintiffs and Class members would rely on Defendant's skill and judgment to provide a reliable, secure, and continuously functioning IID suitable for those purposes.

134. An implied warranty of merchantability arose by operation of law in connection with the lease of the IID.

135. An implied warranty of fitness for a particular purpose also arose by operation of law in connection with the lease of the IIDs.

136. The IIDs were not merchantable and were not fit for their ordinary purpose of enabling users to provide compliant breath samples and start their vehicles, because the IT Network was designed, configured, and maintained in a manner that rendered it vulnerable to cyberattack and service disruption.

137. The IIDs were further not fit for the particular purpose for which they was required—namely, to provide reliable and continuous functionality necessary for lawful vehicle operation—because it depended on inadequately secured systems and lacked reasonable safeguards to ensure operability of the IT Network during foreseeable cybersecurity incidents.

138. As a result of these defects, Defendant's IIDs failed to perform their essential function, including by preventing Plaintiffs and Class members from starting and operating their vehicles despite providing compliant breath samples.

139. Defendant breached the implied warranties of merchantability and fitness for a particular purpose by providing IIDs that were not reasonably fit, safe, or reliable for their intended and foreseeable uses.

140. Defendant had notice of the foreseeable risk to its IT Network by cyberattacks and that data breaches and service disruptions are prevalent yet Defendant failed to implement or maintain reasonable cybersecurity and operational safeguards to mitigate those known and foreseeable risks.

141. Privity of contract is satisfied or otherwise not required because Defendant directly marketed and supplied the IID to Plaintiffs and Class members and Class members were the intended and foreseeable users of Defendant's IIDs. Plaintiffs and Class members paid money to lease the IIDs and to install and service the devices.

142. As a direct and proximate result of Defendant's breaches of implied warranties, Plaintiffs and Class members suffered damages, including but not limited to loss of use of their vehicles, lost wages, out-of-pocket expenses, and other economic and non-economic injuries.

## COUNT V

### STRICT PRODUCTS LIABILITY (DESIGN DEFECT)
### (On behalf of Plaintiffs and the Class)

143. Plaintiffs restate and reallege all preceding factual allegations above as if fully set forth herein.

144. At all relevant times, Defendant designed, manufactured, tested, marketed, distributed, and leased IIDs and maintained the associated software, firmware, and network infrastructure (collectively, the "IT Network") used by Plaintiffs and Class members.

145. The IIDs were placed into the stream of commerce by Defendant and were intended to, and did, reach Plaintiffs and Class members without substantial change in the condition in which it was designed, manufactured, and distributed.

146. The IIDs include not only the physical IID installed in users' vehicles, but also the backend systems, connectivity features, and software necessary for the IID to function as intended,

including the ability to authenticate users, record breath samples, and permit vehicle ignition upon a valid test.

147.    At all relevant times, the IIDs were used in a manner that was reasonably foreseeable by Defendant, including use by individuals required by law to install and rely upon the IIDs for lawful vehicle operation.

148.    Defendant's IIDs were defectively designed in that they depended upon and inadequately secured and vulnerable IT Network that lacked reasonable cybersecurity protections and failed to incorporate safeguards necessary to ensure continued operation in the event of a cyberattack or system intrusion.

149.    The foreseeable risks of harm posed by the IID's design—including service disruptions preventing users from starting their vehicles—could have been reduced or avoided by the adoption of reasonable alternative designs.

150.    The omission of such reasonable alternative designs rendered Defendant's IIDs not reasonably safe for their intended and foreseeable uses.

151.    As a direct and proximate result of the defective design of the IIDs, unauthorized third parties were able to access Defendant's IT Network, causing a widespread service disruption that rendered the IIDs inoperable or unreliable for Plaintiffs and Class members.

152.    As a result, Plaintiffs and Class members were unable to start and operate their vehicles despite providing compliant breath samples, thereby depriving them of the IID's essential function.

153.    The defective design of Defendant's IID was a substantial factor in causing Plaintiffs' and Class members' injuries.

154.    As a direct and proximate result of Defendant's conduct and the defective design

of the IID, Plaintiffs and Class members suffered damages, including but not limited to loss of use of their vehicles, lost wages, out-of-pocket expenses, and other economic and non-economic losses.

155.    The IID was not accompanied by adequate warnings or instructions regarding the risk of service disruptions caused by cybersecurity vulnerabilities, nor did Defendant adequately disclose that the IID could become nonfunctional due to foreseeable cyber incidents.

156.    Defendant is strictly liable to Plaintiffs and Class members for placing a defective and unreasonably dangerous product into the stream of commerce.

## COUNT VI

**VIOLATION OF THE IOWA CONSUMER FRAUD ACT ("ICFA")**
**Iowa Code §§ 714h.3, 71 4h. 5**
**(On Behalf of Plaintiffs and the Class)**

157.    Plaintiffs restate and reallege all preceding factual allegations above as if fully set forth herein.

158.    The ICFA prohibits a person or entity from engaging:

> … in a practice or act the person knows or reasonably should know is an unfair practice, deception, fraud, false pretense, or false promise, or the misrepresentation, concealment, suppression, or omission of a material fact, with the intent that others rely upon the unfair practice, deception, fraud, false pretense, false promise, misrepresentation, concealment, suppression, or omission in connection with the advertisement [and/or] sale[.]

> Iowa Code § 714H.3(1).

159.    The Iowa Code defines an unfair practice as "an act or practice which causes substantial, unavoidable injury to consumer that is not outweighed by any consumer or competitive benefits which the practice produces." Iowa Code § 714.16(1)(n).

160.    At all relevant times, Defendant was engaged in trade and commerce in Iowa and

27

nationwide through the marketing, sale, and servicing of IIDs and related monitoring services.

161.    Defendant represented to consumers, including Plaintiffs and Class members, that its IID products and services were reliable, functional, and supported by adequate systems necessary for continuous and accurate operation, including representations regarding "reliable technology," "ease of use," and "excellent customer support."

162.    These representations were material to reasonable consumers because the IID is required for lawful vehicle operation and compliance with court-ordered or statutory obligations.

163.    Contrary to these representations, Defendant failed to implement and maintain reasonable and appropriate cybersecurity measures and system safeguards necessary to ensure the reliability and continuous operation of its IID platform.

164.    Defendant's conduct constitutes unfair practices within the meaning of Iowa law because it caused substantial, unavoidable injury to consumers—namely, the loss of access to their vehicles and inability to comply with legal driving requirements—which was not outweighed by any countervailing benefits.

165.    Defendant also engaged in deceptive practices by misrepresenting and omitting material facts, including by:

   a.  representing that its IIDs were reliable and functional when they were dependent on inadequately secured and vulnerable IT Network;

   b.  failing to disclose that its IT Network lacked adequate cybersecurity protections, redundancy, and fail-safe mechanisms; and

   c.  failing to disclose the foreseeable risk that cyber incidents could render the IIDs inoperable and prevent lawful vehicle use.

166.    Defendant knew or reasonably should have known that its cybersecurity practices

28

and IT Network were inadequate and that the risk of system disruption was significant and foreseeable.

167. Defendant had a duty to disclose these material facts because it possessed superior knowledge regarding its IT Network, and because such facts were not reasonably discoverable by Plaintiffs and Class members.

168. Defendant intended that Plaintiffs and Class members rely on its omissions and misrepresentations in leasing and using the Defendant's IID products and services.

169. Plaintiffs and Class members reasonably relied on Defendant's representations and omissions when selecting and using Defendant's IID products and services.

170. As a direct and proximate result of Defendant's unfair and deceptive acts and practices, Plaintiffs and Class members suffered ascertainable losses, including but not limited to:

    a. loss of use of their vehicles;

    b. lost wages and income;

    c. fees paid for services that were unavailable or nonfunctional;

    d. out-of-pocket costs incurred to mitigate the disruption; and

    e. loss of time and other consequential economic damages.

171. Defendant's conduct was willful, knowing, and in reckless disregard of the rights of Plaintiffs and Class members.

172. Pursuant to Iowa Code § 714H.5(1), Plaintiffs and Class members seek all available relief, including actual damages, equitable relief, and reasonable attorneys' fees.

173. Plaintiffs and Class members further seek injunctive relief requiring Defendant to, *inter alia*:

    a. implement and maintain reasonable cybersecurity measures and system

safeguards;

b.  ensure redundancy and fail-safe functionality for its IID systems; and

c.  submit to periodic independent security audits and monitoring.

## VII.    PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

(a)    For an order determining that this action is properly brought as a class action and certifying Plaintiffs as representatives of the Class and their counsel as Class Counsel;

(b)    For an order declaring that Defendant's conduct violates the laws referenced herein;

(c)    For an order finding in favor of Plaintiffs and the Class on all counts asserted herein;

(d)    For damages in amounts to be determined by the Court and/or jury;

(e)    For an award of statutory damages or penalties to the extent available;

(f)    For pre-judgment interest on all amounts awarded;

(g)    For an order of restitution and all other forms of monetary relief; and

(h)    Such other and further relief as the Court deems necessary and appropriate.

## VIII.    JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury of all claims in this Class Action Complaint so triable.

Dated: June  15, 2026                    /s/ *Brian O. Marty*_____

J. Barton Goplerud, AT0002983
Brian O. Marty, AT0011622
**SHINDLER ANDERSON GOPLERUD &**

30

**WEESE P.C.**
5015 Grand Ridge Drive, Suite 100
West Des Moines, Iowa 50265-5749
Tel: (515) 223-4567
Facsimile: (515) 223-8887
Email: goplerud@sagwlaw.com
Email: marty@sagwlaw.com

John J. Nelson
**MILBERG, PLLC**
280 S. Beverly Drive-Penthouse
Beverly Hills, CA 90212
Tel.: (858) 209-6941
Email: jnelson@milberg.com

Linda P. Nussbaum*
**NUSSBAUM LAW GROUP, P.C.**
1225 Franklin Avenue, Suite 325
Garden City, NY 11530
Tel: (917) 438-9189
Email: Lnussbaum@nussbaumpc.com

*Attorney for Plaintiffs and*
*The Proposed Class*

-with-

Nickolas J. Hagman*
Alex Lee*
**CAFFERTY CLOBES**
**MERIWETHER & SPENGEL, LLP**
135 S. LaSalle, Suite 3210
Chicago, IL 60603
T: 312.782.4880
nhagman@caffertyclobes.com
alee@caffertyclobes.com

Raina Borrelli*
Cassandra P. Miller*
**STRAUSS BORRELLI PLLC**
980 N. Michigan Avenue, Suite 1610
Chicago, Illinois 60611
T: (872) 263-1100
F: (872) 263-1109
raina@straussborrelli.com
cmiller@straussborrelli.com

31

**CERTIFICATE OF SERVICE**

I hereby certify that on June 15, 2026, a true and correct copy of the foregoing was filed electronically to the Clerk of Court via the CM/ECF system which will send notification of such filing to all counsel of record.

/s/ Brian O. Marty_____